and 23-2885 Southern District of Iowa, United States v. Demetre Smith. Very well. Mr. Willett, we'll hear from you first. Good morning. Good morning, Your Honor. The Court appreciates, as always, your willingness to accept the appointment in this case under the Criminal Justice Act. Thank you, Your Honor. I appreciate it. Chief Judge Colleton, if it pleases the Court, Judge Loken, Judge Shepard, my client, Najawaun Quinn, received a 408-month sentence consisting of two parts, a 288-month sentence as to Count 1, with 120 months concurrent from Count 3, and 120-month consecutive sentences to Count 2. The fight here, Your Honor, is on what the appropriate base offense level should have been. Judge Ebbinger ruled that the base offense level was 33, based upon United States Sentencing Guideline 2A2.1, Sub A, Sub 1. The defense would argue that it should have been, subparagraph 2, the base offense level should have been 27. If this Court were to agree with our calculation, it would change Mr. Quinn's base offense level from a 35 to a 29, based upon a criminal history category, Roman numeral 6. His guideline range would then become 151 to 188 months. With the 10-year consecutive, that would translate to a guideline range of 271 to 308 months, quite a difference from the 408 months. Your Honor, the problem here is the interpretation of the facts of these respective cases that make up either 2A2.1, Sub A, Sub 1, or 2A2.A, Sub 1, Sub 2. Your Honor, you have been involved in many of these cases, as has Judge Loken, and the facts are paramount. What is lacking here, Your Honor, there's two problems that we have with where we ended up at sentencing. One, as was argued in the appellant's brief, the record is devoid on this issue of premeditation. It's just not clear from the record that my client entered into this shootout with premeditation. The second problem is, as you look at the cases, and this harkens back just a little bit to what I said about a minute ago, is when you're looking at the guidelines instruction in regards to if the object of the offense would have constituted first-degree murder, that's where it seems the opinions differ in terms of their interpretation of facts of the underlying offense. It's interesting to note that in one of the cases cited in my brief, well, first of all, in the Johnson case, Defendant Johnson acquired a handgun and shot a woman nine times in a parking lot. She survived. Well, what about the facts in this case? The facts. Can you lay out the facts and why you think it was clear error to find an attempt to. . . Thank you, Your Honor. The facts in this case. . . Just to finish my thought. Yes, the facts in this case. . . Just to finish my thought. I apologize. I believe the issue is whether there was sufficient evidence to find that the intent that was required for the murder offense, so if you could address that. In terms of the intent, Your Honor, I think the premeditation element goes hand in hand with that, and that's where I think the record is devoid. You have the testimony of Romance Armstrong, the victim in this case, and I lay that out in the brief, but Romance Armstrong would testify that he was sitting in his vehicle when shots were fired, that there was an exchange of gunfire between Romance Armstrong and my client. Romance Armstrong was struck by one of the bullets in his right forearm. The other bullet struck the vehicle. What's more insightful, Your Honor, is the testimony of Austin Ruiz, who was sitting in the vehicle before my client went and got out of the vehicle and went to Romance Armstrong's house. Now, it's insightful for what Austin Ruiz does not know. Set aside a moment for the fact that Austin Ruiz was a cooperating individual and received a great benefit from testifying on behalf of the government. Austin Ruiz's problem that night is he knew of no conversation while they were in the car leading up to this confrontation that my client had any plans on having any confrontation with Romance Armstrong. Well, premeditation can be two seconds. It can be, Your Honor, and I agree, but there's still an absence of the record of where that two seconds becomes because beforehand, Austin Ruiz can't tell us that our client said anything. After my client comes back to the car, he makes a statement that I think I killed him, but that's after the fact. Austin Ruiz's other problem, Your Honor, is he was high as a kite. He'd had numerous blunts of marijuana by his own self-admission, and he'd had four or five shots of Patron. But he remembers no conversation leading up to my client getting out of the car, and there's no conversation, there's no indication from Austin Ruiz that he had any idea that a shooting was going to take place. And so that lack of premeditation is just absent in the record. And that's, Chief Judge Colleton, to get back to your point, that issue of intent, that's where it becomes problematic. What can you infer just from the fact that he aimed at the car and shot at the man? Well, what we can infer, one can talk about intent, one can talk about deliberation. But we also know it was a shootout. It appears that my client shot first. I'm not going to argue that he shot first. I'm not going to argue that he shot in self-defense. But there was an exchange of gunfire. What's your theory of the shooting? Why was it not intentional? Was it accidental? I'm not going to say it's accidental, Your Honor, when there's multiple shots. Okay? I'm not going to sit here and belabor that point with you. But I'm not sure that he had any intent until he got there and saw him. Okay? But that goes to Judge Loken's point. He may not have expected to see the guy. But once he got there and saw the victim and decided, I'm going to shoot him, why doesn't that qualify? Well, because then we get back to the object of the offense. And, of course, the government's going to get up and say this was first-degree murder. And to have first-degree murder, you have to have premeditation. And that's where I think it falls down, Your Honor. I thought there was evidence that he was at the house, at R.A.'s house, because R.A. had hit somebody, you know, one of his associates. We didn't say he hit you, Your Honor. The reason he was there, the evidence of why he and Ruiz were in the car at all, sets the table for the object of whatever shooting offense he committed. I'm going to respectfully disagree, Your Honor. I think the precursors to that or the preliminary events to that were the exchange of text messages and the fact that there was a burglary. And that was what was getting to be the issue. But if I can, Your Honor, getting back to the object of the offense for just a second, where it gets interesting is you get a case like, and I cited it in my brief, the Conley case, where Mr. Howard was the victim of an attempted shooting. Conley was firing at a vehicle where Mr. Howard was ducking to avoid fire. And there, it's 2A, 2.1 sub A sub 2. So, Your Honor, in the perfect world, for a base offense level 33 for murder, I would suggest that the government ought to point to a dead body. Now, we don't have a dead body, and this is attempted murder in the first degree. Why do you need a dead body for attempt? You don't, and I agree with the point. All right, so I don't get the point you're making. The point I'm trying to make, Your Honor, is this. It's when Mr. Hanson says this was attempted murder in the first degree, he still needs premeditation. And that is what I keep coming back to as lacking in this record. That's the point we're trying to make. So, Your Honor, I see my time. But if you want to save a minute for rebuttal, you'll need to. I'm going to stop right now because I know Mr. Thank you for your argument. My co-counsel will need that time. Thank you, Your Honor. Mr. Breedlove, we'll hear from you, and the court likewise appreciates your willingness to accept the appointment, in this case, under the Criminal Justice Act. You may proceed. Thank you. Counsel, Madam Clerk. I first want to thank Mr. Ouellette for his wonderful mentorship of me through this, this being my first time in front of Your Honors, and to the teacher in the back that brought a field trip full of high school students. That is wonderful to see, and it's worth ten seconds of my limited time. Understanding our democracy is key to preserving it. Since it is your first time, let me mention that you can adjust that podium to match your height if you wish. There's a button on the side and the microphone as well. Thank you, Your Honor. I say that understanding our democracy is key to preserving it because in our democracy, in our criminal justice system, technicalities do matter. That is what this branch of the government is all about, and it's incredibly important. Those matter in particular in this case when we're talking about the jury instructions. In Final Instruction 15, it differed from what I requested. I requested language based on the Crenshaw case, and the language differed. What happens is, in Crenshaw, there has to be a structure distinct, and instead the instruction we got was that there has to be coordination. I mean, the instruction has to comply with Boyle, and Boyle is different than Crenshaw. That's correct, but Crenshaw hasn't been overruled. Well, it's been all but. I understand that, Your Honor. What do you mean by overruled? Well, if it's superseded by a Supreme Court opinion, you see, we don't need an Eighth Circuit case that says it's quote overruled. It's just superseded. Well, I understand that, Your Honor. All right. Well, then why isn't it superseded by Boyle is the question. Because I don't think they are at odds. What Crenshaw talks about is just the word structure versus the word coordination, and I think you can have both because the difference being when we talk about structure, the definition being an arrangement of complex relations or a coherent form or organization versus coordination, which is just working together. And as an example, if I was up here taking notes, Your Honor, and my pen runs out of ink, I could say, Mr. Ouellette, could you please bring me a pen, and he probably would, or he'd hand me a pen. That would be coordination, certainly. But there's no structure between Mr. Ouellette and I that says he's the pen guy. He's responsible for that. Boyle couldn't have been clearer that there does not need to be, quote, structure. I understand your point, Your Honor, and I understand the holding in Boyle, but I still think there needs to be something. Otherwise, everything becomes racketeering. If there is no difference. Boyle talks about that, and all you have to do is have an instruction that's consistent with Boyle's explanation of why the word structure is more than is required. I understand that, Your Honor. I get your coordination point. I understand it, and it's valid. But Boyle doesn't say just, I mean, I think they even give examples of, at least one example of coordinated activity which would not satisfy the enterprise requirement. And I agree, Your Honor. The issue becomes, as I opened with, it is very technical, right, the difference. And I do not think the instructions that were given. You know, our standard of review for instruction errors is a big hill to climb. Well, I understand that, Your Honor. I do believe it was prejudicial because of the difference between the words. And I do believe that it was, at the time, an accurate statement of the law, unless Crenshaw is indeed overturned. Regardless, however, of which definition is used, there was no enterprise under any of the definitions, either the erroneous one that I think the court gave or the definitions that I proposed that I think are more reflective of the law. And it's difficult to prove a negative, obviously, Your Honors. And yet, in trial, I think Mr. Warren and I did prove that. I believe we proved that there was no enterprise. There was no orders. There was no hierarchy. There was no structure, organization, anything. I would submit, even if the standard was like an affirmative defense and it would have been our burden to prove that the enterprise didn't exist, which obviously is not the standard, I think we did prove that throughout the course of the trial and throughout the evidence that was brought out at trial. As a government's own expert said, you don't know an organization or an alleged organization without talking to the members that are in it. Well, what did we hear from the members that were in it, the cooperating members? There was no structure. There was no rules. There was no hierarchy. These were, and I have not hidden that from day one. I might have been in my opening statement. These were violent men. Again, the evidence is clear. It's my client. Working together for a common purpose. Pardon me, Your Honor? Working together for a common purpose. The evidence is overwhelming on that. I disagree, Your Honor. I know you do, but I've got the list by dates of all the different violent things they did within a short period of time, usually against the same villains, in their view, because they were villains because they didn't like their gang, didn't like our gang. That is sufficient. But the evidence doesn't quite show that, Your Honor, because there are also a number of times, as I point out in my brief. The jury would find that. I mean, I've got them all listed, and they go bang, bang, bang, shooting after shooting, within a matter of months, same people coordinating. I mean, they're getting in the same car together. They've got to find each other to go to the same place to get after the same bad guy. But it's not always the same bad guy, Your Honor. They had more than one gang that they considered enemies. They had an Illinois gang, and they had the Fifth Street folks from Rockford, and they had the 12th Street gang that they had broken off from. They had a lot of enemies. They also engaged in activities with those people, as evidenced at the trial and in the brief as well. And regardless, Your Honor, there is still no structure or organization to this. I think it doesn't make for a good legal standard. But if you read cases like Lim and Tillett, which are referenced in the brief, they read like a John Grisham novel. You have interesting plots. So does this, frankly. I disagree, Your Honor. I know you do. This is a series of violence, but it's not like Lim and Tillett or a Grisham novel because there's no plot twists. There's no finding out, as in Lim, that there's a financier in Canada and farms in Columbia and boats and those sorts of things. It is exactly what the government described what they thought the entity was, which is savage life. And savage is absent structure. And, of course, it's all to facilitate their drug dealing. But that wasn't money making. Again, Your Honor, the evidence was. But that's one of the things they're protecting, as well as their reputation or whatever. The evidence was, Your Honor, that the Quad Cities is a free market for drugs. There is no owning any territory, anything like that. People can buy and sell to whoever they want. It wasn't related at all to anything Savage Life did. They did do those things, but there was evidence that they were buying and selling drugs from other alleged rival gangs, Your Honor. And so the relationship between the violence and the separate structure and the separate structure for those offenses just, I understand the evidence is overwhelming of violence. I do not disagree with you. It is absolutely overwhelming of violence. I charge my client with the shooting at the mall. He is guilty of that. He is not guilty, Your Honor, of doing this on the technicalities that the statute requires. And with that, Your Honor, if there are no further questions, I reserve the remainder of my time for rebuttal. Very well. Thank you for your argument. Thank you. Mr. Hanson, we'll hear from you. Good morning. You may please the court. We have two requests this morning. First, of course, is that the court affirm the convictions and sentences for these two defendants. But second, and I think equally important, is that this court clarify what is required to prove the existence of an enterprise. And in particular, addressing the Crenshaw case and to put a red flag on Crenshaw.  You don't have to preach it again. Frankly, we won't do that if we don't have to. But I think the last ten minutes has shown that there still exists some. Don't give me that speech. It's in your brief. We understand the point. But we don't sit here and do the government favors in advisory lawmaking. You'll get a decision on whether this evidence does or does not amount to an enterprise, and you can work with that. And I agree that that is the proper result in this case, but some additional guidance would be helpful. When we look at the evidence here, it's not a question of considering what wasn't present with the Savage Life Boys. But we should look at what characteristics were present. And everything that the government proved in this case showed overwhelmingly the existence of an enterprise. They had an identifiable brand. They had gang signs. They had tattoos. They supported each other. They put money on each other's books when they went to jail. They helped each other after they got out of prison. They used sales of drugs. I thought the argument this morning was on the instruction. Now you're going off on stuff they didn't argue. It's all briefed. Well, I believe Mr. Breedlove did start getting into sufficiency of the evidence. But if we are... So you don't have any response to the instruction issue? The instruction issue is that Boyle controls. There's just no question that Boyle... Well, all right. Why don't you tell us what Boyle says versus what the instruction says? I mean, you can refer to pages in your brief. Yeah. So the element that the defendants wanted from Crenshaw, that an ascertainable structure beyond that inherent in the racketeering activity... Don't talk about what was wrong with their request. Tell us why the instruction given was not reversible error. The instruction given exactly followed Boyle. Okay. What page do I find? Was this discussed at the instruction conference? Yes, it was. What are the pages? I don't have the exact page number. It was around 1180 in the transcript. I don't know that that's exactly right. But there was an express discussion and really ongoing discussions that were off the record that the court referenced. You can't talk about those. I know. All right. So was this specific issue discussed, the one that was emphasized in argument this morning? Absolutely. The defendants both requested instructions. What did the trial court say about Crenshaw? And the district court said Crenshaw is no longer good law after Boyle. Okay. And expressly said the government, consistent with Boyle, does not have to prove an ascertainable structure beyond the racketeering activity. That is completely in accord with what the Supreme Court said in Boyle. And the court followed Boyle, gave an instruction consistent with Boyle, required proof of a common purpose, relationships among the people involved in savage life, and then an existence that spanned their racketeering activities. That is 100% in line with what Boyle said. And really the only objection that the defendants had is they wanted that extra element from Crenshaw, which is no longer the law. So the court absolutely did not abuse its discretion, giving the instruction that it did. Turning to the attempted murder cross-reference, there really is no question that this was attempted first-degree murder. Well, there's a question because Mr. Ouellette says there wasn't. Well, I guess I should rephrase. There's no reasonable question that the court did not clearly err on that. And this was not a shootout, as Mr. Ouellette said. This was an ambush. It was no accident that Mr. Quinn showed up at Romance Armstrong's house, didn't park in front, parked the block behind, snuck up in the dark through the backyard, came around the house before Romance Armstrong could even tell what was going on, and started firing shots. So when we look at what is required for premeditation, it's a preconceived design. It's motive. All of those were proven in this case. There's no clear error about this being a thought-out premeditated act rather than just a spur-of-the-moment, we happen to run into each other on the street and we don't like each other, so we start exchanging shots. This was absolutely a planned ambush. And although the victim did, in self-defense, fire shots back, it was not the sort of a duel where they were coming together in a mutual fight. It was completely preconceived by Mr. Quinn to sneak up in the dark and attack. All right, do you have anything further? So with that, the government asks that this court affirm the defendant's convictions and sentences. Very well, thank you for your argument. Mr. Watt, I think you had about one minute if you care. Wait a minute. Your Honor, please report. Mr. Breedlove is going to take the entire remaining rebuttal. Very well, thank you. Very well, thank you for that. You may proceed with rebuttal. Thank you, Your Honor. With relation to the time, I believe, for Mr. Ouellette's client, the 408 months is greater than necessary and it should be remanded for resentencing in the appropriate range. The premeditation design, again, there was no premeditation. I understand, as Judge Loken pointed out, premeditation can happen quickly, but it can also not happen at all. And whether it happens quickly or not at all is the government's burden to prove. And they did not prove that it happened at all, but argue that it happened quickly. And there was simply no proof that there was any sort of premeditation or plan. And again, that goes back, Your Honor, to what I said towards the end of my argument. The name of this alleged group is Savage Life. Savage means ungoverned, no rules, those sorts of things. It is the antithesis of what these laws are designed for, which is they are designed for organizations that have structure, that have meaning, that are doing things, committing crimes to support an organization. They simply are not doing that. They may have similar names. They may have tattoos, although the record reflects, I believe, that my client did not have tattoos. But then the government goes into things that all humans do for one another. They argue, well, they supported each other when they were in jail. Shouldn't we support our friends, and for many of these people, family, when they are in jail? What is wrong with putting money on someone's books? How is that evidence of a criminal purpose instead of evidence of humanity? That is what we should be doing. They should be doing those things. And so I understand the government's desire in these cases to cast a broad net, because we do have a problem with violence in our country and in our community and in the Eighth Circuit and in the border community of the Quad Cities, which covers this case. But that doesn't mean they can use a tool that was designed for something else to punish these men. These men committed shootings. They should be charged with those shootings. They should be found guilty of those shootings. These men did not do so in violation of federal law that makes it a crime to do so in an organized manner in support of the organization. And for those reasons, Your Honor, this Court should rule in favor of the defendants in the manners requested in the briefs. Thank you. Very well. Thank you for your argument. Thank you to all counsel. The cases are submitted, and the court will file a decision in due course.